**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**

Coldwell Banker
Real Estate, LLC

     v.                               Civil No. 08-cv-50-LM

Brian Moses Realty, Inc.
Brian Moses & Assoc. Realty,
Inc., and Brian Moses

## O R D E R

Plaintiff Coldwell Banker Real Estate, LLC ("CB") is a franchisor of real estate offices across the United States. Defendant Brian Moses ("Moses"), through his businesses, defendants Brian Moses Realty, Inc. and Brian Moses & Associates Realty, Inc., (collectively "BM Realty"), owned two CB franchises from September 1996 until January 2007, one in Nashua and the other in Salem, New Hampshire. This dispute arises out of that franchise relationship and involves both common law and statutory claims and counterclaims, including breach of contract, trademark infringement and dilution, unfair trade practices, unjust enrichment, negligent misrepresentation and fraud.[1] Before the court are cross motions for partial summary judgment. Document

---

[1] On November 12, 2009, CB's claims against Brian Moses individually were settled for $20,000. See Pl.'s Mot. for Partial Summ. J. (document no. 55) ("Pl.'s Mot."), Mem. in Supp. (document no. 55-2) ("Pl.'s Mem.") at 7; see also Pl.'s Mem., Ex. 5. Accordingly, only the two business defendants remain.

nos. 55 and 56.  As explained below, both motions are denied in part and granted in part.

Discussion

**1.  Background Facts**

BM Realty entered into two separate franchise agreements with CB.  The First Franchise Agreement, effective September 1, 1996, created an independent CB residential real estate office in Nashua, New Hampshire (the "Nashua franchise").  See Pl.'s Mem., Ex. 1, Jacqueline Bertet's November 10, 2009 affidavit ("Bertet Aff."), attaching Ex. A (the "First Franchise Agreement").  It had a ten-year term which expired on September 1, 2006.  See Bertet Aff., Ex. A, ¶ 1.5.  BM Realty acquired a second CB residential real estate franchise, in Salem, New Hampshire (the "Salem franchise"), by transfer from another franchisee on January 18, 2001.  See Bertet Aff., Ex. F.  The Salem franchise was governed by a nearly identical franchise agreement that became effective the date of the transfer and also had a ten-year term, ending January 18, 2011.  See Bertet Aff., Ex. G (the "Second Franchise Agreement"), ¶ 1.5.  Both franchise agreements provide in prominent, bold letters at the beginning of the contract that:

> THE PARTIES AGREE THAT THIS AGREEMENT SHALL
> GOVERN THEIR RELATIONSHIP IN CONNECTION WITH
> FRANCHISEE'S OPERATION OF ITS INDEPENDENT
> RESIDENTIAL REAL ESTATE BUSINESS.

2

Bertet Aff., Ex. A at CB-3, Ex. G at CB-57.  The agreements
provide that they cannot be modified except as expressly
permitted or by a subsequent written agreement signed by both
parties.  See id., Exs. A & G, ¶ 17.7.  The franchise agreements
explicitly state that they constitute "the entire agreement of
the parties," superceding "any and all prior negotiations,
agreements or understandings between the parties," whether oral
or written.  See id. ¶ 16.5.[2]

Relevant to this dispute, the franchise agreements contain
detailed terms explaining how the franchisee shall maintain the
offices, conduct the businesses, and, in particular, use CB's
marks.  Under the contracts, a franchisee is required to identify
itself conspicuously in all commercial dealings as a CB
franchise.  See id. ¶ 6.7(b).[3]  A franchisee is required to use
its "best efforts" to conduct the business in accordance with the
franchise agreements, and to continually strive to develop the

---

[2]Except for a few, minor discrepancies not relevant here,
both franchise agreements have identical provisions, with
parallel numerical sections and paragraphs.  Therefore, unless
otherwise noted, reference to a provision pertains equally to
both the First and Second Franchise Agreements.

[3]BM Realty advertised itself as "Coldwell Banker Brian Moses
& Associates Realty, Inc." and used that named and other CB marks
in magazines, newspapers, real estate publications, flyers,
clothing, flags, floor mats, signage and business cards.  See
Defs.' Mot. for Summ. J., Mem. in Support (document no. 56-2)
("Def.'s Mem.") at 3; see also id. Ex. 2 (examples of ads in real
estate publications).

business to its greatest potential.  <u>Id.</u> ¶ 6.5.  The franchisee agrees that throughout the term of the agreement it will meet "System Standards for Office and signage appearance and cleanliness" and make reasonable changes to satisfy those standards.  <u>Id.</u> ¶ 6.10.  A franchisee retains the right to own and operate other businesses that are not directly competing with the real estate business[4]; however, none of the CB marks can be used in connection with such other businesses.  <u>Id.</u>, ¶¶ 6.4 & 6.6.  The franchise agreements make detailed provisions for the payment of royalties, performance premium awards and advertising fees, for the maintenance of business records, and for the periodic reporting of business information.  <u>See</u> <u>generally</u> <u>id.</u>, §§ 7, 8 & 11.  Finally, the agreements explicitly state that any unauthorized use of any CB marks constitutes a breach of the contract.  <u>See</u> <u>id.</u> § 9.1.

From 1996 through 2000, Moses's relationship with CB was positive; the Nashua franchise was profitable and Moses wanted to

---

[4]The agreements define "Competitive Business" as "any business enterprise engaged in operating or franchising a real estate business or any other business that is the same as, or similar to, the Franchised Business, as such may evolve over time."  <u>Id.</u> ¶ 15.2.  Though BM Realty operated residential real estate offices, the term "real estate business" included any commercial, industrial or agricultural real estate services, as well as any business that provided ancillary real estate services, such as title searches, appraisals, insurance and mortgage banking.  <u>Id.</u> ¶¶ 6.4(c) & 6.6

grow BM Realty's market share.  <u>See</u> Pl.'s Mem., Ex. 3, Seth L.
Huttner's November 12, 2009 Affidavit ("Huttner Aff."), Ex. A
(excerpts from the 4/2/09 deposition of Moses ("Moses Dep.")) at
81:12-17.  In the middle of 2000, a CB employee who was Moses's
business consultant, Christine Dowd ("Dowd"), told Moses about a
Salem franchise being offered for sale.  <u>Id.</u> at 81:18-82:11; <u>see
also</u> Defs.' Obj. to Pl.'s Mot. for Summ. J. (document no. 60)
("Def.'s Obj."), Ex. E (excerpts from the 10/23/09 deposition of
Christine Dowd ("Dowd Dep.") at 27:4-22.  Moses discussed the
possibility with Dowd[5], along with other business advisors
outside of CB, and the Salem franchise's prior owner, Nettie
Thompson.  <u>See</u> <u>generally</u> Moses Dep. at 82-83.  Moses understood
these people to have told him the Salem franchise was "a good
deal and a good opportunity."  <u>Id.</u> at 85:13-18, 86:2-6 & 96:2-16.
CB was looking to expand its market share in Salem, a pursuit
which interested Moses.  <u>See</u> Huttner Aff., Ex. C (excerpts from
the 4/30/09 deposition of David Shortsleeve ("Shortsleeve Dep.")
at 70:11-72:13; <u>see</u> <u>also</u> Huttner Aff., Ex. E, Dowd Dep. at 40:7-
41:23.

---

[5]Moses remembered that he also discussed buying the Salem
franchise with another CB business consultant, Thomas Aylward,
but Aylward did not come to work for CB until after the Salem
franchise was acquired by Moses.  <u>See</u> Huttner Aff., Ex. D
(excerpts from the 5/12/09 deposition of Thomas Aylward ("Aylward
Dep.") at 9:3-5 & 39:9-40:6.

Within months of opening the Salem franchise, Moses realized it was not a good investment and that the business needed a lot of work to "turn it around."  Moses Dep. at 97:18-23 & 98:7-18. Moses claimed that, prior to his purchase, CB presented him with financials on the Salem franchise that did not accurately reflect its business condition.  Moses Dep. at 84:1-13 & 100:1-9.  The Salem franchise struggled, and Moses's relationship with CB became strained.  Neither Moses nor CB was pleased with the lack of growth at the Salem franchise.  See Shortsleeve Dep. at 97:14-98:17

A principal complaint of Moses was that his two franchises were not getting referrals from CB corporate as he had expected. See generally Moses Dep. at 190-95.  Cendant Mobility, another company owned by the same parent corporation as CB, handled CB referrals.  See id. at 190:6-11.  When Moses complained to CB about the lack of referrals, CB informed Moses that he needed a separate contract with Cendant Mobility.  Such a contract would have given BM Realty an exclusive referral radius around his Nashua and Salem franchises; without the contract, CB corporate could not provide BM Realty with referrals.  Id. at 190-93; see also Shortsleeve Dep. at 110-11.  Moses applied for a referral contract with Cendant Mobility but, because two other larger residential real estate brokerages with multiple offices in the

area already had contracts with Cendant Mobility, his application was rejected.[6]  See Shortsleeve Dep. at 110:1-20 & 111:8-20.  A further complaint of Moses was that he believed CB had been less than forthcoming about several related services it offered, such as mortgage and insurance services, which may have yielded profits for BM Realty had BM Realty been aware of and able to take advantage of them.  See Moses Dep. at 197:4-22.

By late 2005, Moses realized he wanted to get out of real estate sales so that he could pursue his teaching, coaching and sales training work.  He also wanted to find an alternative company where the BM Realty agents could work.  See id. at 199-200; see also Shortsleeve Dep. at 99:1-100:15.  The First Franchise Agreement was due to expire September 1, 2006, but the Second Franchise Agreement did not expire until January 18, 2011.  See Pl.'s Mem., Bertet Aff., Ex. G, § 1.5.  Moses had initially mistakenly believed the Salem franchise ended when the Nashua

---

[6]Cendant Mobility's relationship with the agencies to which it referred clients is not entirely clear.  The record indicates that Cendant Mobility preferred to refer business to larger agencies with multiple offices.  To that end, Cendant Mobility owned The National Realty Trust ("NRT"), which in turn purchased real estate agencies with multiple offices to whom Cendant Mobility would then refer business.  See Dowd Dep. at 40:11-19 & 41:24-42:11.  The record indicates that Dowd had understood Moses wanted to acquire the Salem franchise in order to grow BM Realty and position it for potential acquisition by NRT.  Id. at 40:7-41:2; see also Shortsleeve Dep. at 102:18-104:20.

franchise did, but by September 2005, he realized the two contracts were not coterminous. See Def.'s Obj., Ex. A, Moses Dep. at 126:5-127:14; see also Def.'s Obj., Ex. D (9/19/05 email exchange asking CB to modify the Second Franchise Agreement).[7] Moses tried unsuccessfully to modify his agreements with CB, so as not "to shruck [sic] any of [his] obligations to CB from Salem," but CB would not release BM Realty from the Second Franchise Agreement. See id. Though Moses knew that the Second Franchise Agreement did not expire until January 18, 2011, by early 2006 he had decided to close both offices at the same time. See Moses Dep. at 200:4-18; see also Shortsleeve Dep. at 72:14-75:19.

In 2006, Moses contacted Rick and Hank Stoudt, who owned a Re/Max franchise, to discuss a possible acquisition of BM Realty. See Pl.'s Mem., Ex. 4 (Def.'s Answers to Pl.'s First Set of

---

[7]There is a factual discrepancy in the record about exactly when Moses realized that the two contracts were not coterminous. A CB business consultant covering the New Hampshire market, David Shortsleeve, remembered that sometime in 2002 Moses had contacted CB about changing the termination date of the Salem franchise to make it coterminous with the Nashua franchise, but CB refused to do so and encouraged Moses to expand BM Realty through the Salem franchise. See Shortsleeve Dep. at 73:3-76:4. Whether Moses first realized in 2002 or 2005 the actual termination date of the Second Franchise Agreement does not alter the analysis of the pending motions. As the discrepancy in the record is immaterial, the court will presume for purposes of this order that Moses became aware that the contracts were not coterminous in 2005.

Interrogs. ("Def.'s Ans. to Pl.'s Interrogs."), No. 4.  On July

28, 2006, Moses signed a Merger Agreement with Re/Max Properties

("Merger Agreement"), but the merger was not effective until

September 5, 2006.  <u>See</u> Pl.'s Mem., Ex. 2 (Merger Agreement and

Addendum to Independent Contractor's Agreement).  The parties

intended the Merger Agreement to enable Moses to develop his

business as a real estate trainer and recruiter and Re/Max to

increase its share of the Salem real estate market.  As stated in

the Merger Agreement:

> [Moses] is looking for the best possible
> arrangement for his associates and staff and
> one where he personally can better utilize
> his talents as a real estate trainer and
> recruiter without the distractions of
> management responsibilities.  [Moses] is also
> seeking to associate with a reputable,
> growing firm where he can contribute in a
> meaningful way to that growth.  RE/MAX
> Properties seeks to continually gain and
> maintain market share through growth.  RE/MAX
> sees a merger of the two companies as an
> opportunity to take that growth and market
> share to a new level.  RE/MAX aims to achieve
> this by establishing with [Moses] a system to
> attract newer, less productive associates
> than its model has previously allowed, but
> ones that can excel with the proper training
> and skills.

<u>Id.</u> at Re/Max 0034.  Moses's role within Re/Max was to be "one of

an independent consultant engaged in training and recruiting."

<u>Id.</u> at Re/Max 0035.

The Merger Agreement anticipated that Moses would be responsible for his existing office space and any and all expenses related to his CB franchise business, before, during, and after the merger.  See id. at Re/Max 0034.  It also provided that Moses would not be involved in listing or selling activity, but would be responsible for "limited sales management," for assisting with "the support and ongoing training of his existing agents," and for referring business to Re/Max associates for a "mutually agreeable referral fee."  Id.  The Merger Agreement allowed Moses to continue his association with the Craig Proctor organization (where he pursued real estate sales training work) and with his other, non-real estate business ventures.  See id.

On September 1, 2006, the expiration date of the First Franchise Agreement, Moses and BM Realty closed the Nashua franchise and shortly thereafter began working with Re/Max, pursuant to the Merger Agreement.  At the expiration of the First Franchise Agreement, Moses knew the Nashua franchise was behind in its payments (royalties and national advertising fees) due to CB, but he did not know exactly how much money was owed.  See Moses Dep. at 78:8-19 & 79:6-19.  The Nashua franchise "Custom Account Status Report," dated November 6, 2007, reflected that BM Realty owed CB $47,378.53 in unpaid royalties.  See Pl.'s Mem., Bertet Aff., ¶ 3 and Ex. B.

10

Also on September 1, 2006, Moses and BM Realty ceased operations at the Salem franchise and moved out of the office, leaving behind some plaques on the wall, office furniture, and one CB sign on the side of the building.  <u>See</u> Moses Dep. at 176:21-177:17; <u>see</u> <u>also</u> Pl.'s Mem., Ex. 4, Def.'s Answers to Pl.'s First Set of Interrogs., Nos. 10 & 11.  At that time, Moses also knew that the Salem franchise, like the Nashua franchise, was behind in payments due to CB.  <u>See</u> Moses Dep. 130:22-131:15. Though Moses was not aware of exactly how much money was owed at the termination of the franchise agreements, he was willing to settle accounts with CB then.[8]  <u>See</u> <u>id.</u> 164:15-23 & 165:1-10.  A "Custom Account Status Report" for the Salem franchise dated November 6, 2007, reflected that $2,161.26 was due at that time. <u>See</u> Pl.'s Mem., Bertet Aff., ¶ 21 and Ex. J.

When CB discovered that BM Realty had closed the Salem franchise and merged with Re/Max, CB determined that such actions constituted a material breach of the Second Franchise Agreement, as BM Realty was both engaged in a competitive business and had abandoned the franchise.  <u>See</u> Bertet Aff., Ex. G, ¶ 13.2(g)

---

[8]BM Realty and CB had a history of account discrepancies, which BM Realty attributed to CB's internal bookkeeping and CB attributed to BM Realty's underreporting of sales.  Nonetheless, until the fall of 2005, the parties had reconciled their accounts amicably through CB's routine audits.  <u>See</u> Moses Dep. at 131:3-11 & 169:21-170:18; <u>see</u> <u>also</u> Shortsleeve Dep. at 113:4-23.

(failing to operate the office for 7 consecutive days allows CB
to terminate) & ¶ 15.2 (restricting franchisee from engaging in
competitive business).  CB concluded that Moses and BM Realty
were in non-curable default of the Second Franchise Agreement.
See id. Ex. G, ¶ 13.1 (providing right to terminate for "good
cause").  CB notified Moses by letter of its decision to
terminate the contract, effective January 10, 2007.  See Pl.'s
Mem., Bertet Aff., Ex. I (termination letter).  That letter
informed Moses and BM Realty of certain advertising fees due
under the Second Franchise Agreement and of CB's right to conduct
a post-termination audit of the Salem franchise's books.  See id.
The termination letter also instructed Moses and BM Realty to
cease identifying themselves with CB:

> These post termination procedures require you
> to immediately cease the use of all Coldwell
> Banker Trademarks.  The de-identification
> procedures require you to remove all signs,
> cease all advertising, remove any listing in
> any phonebooks, destroy all letterhead or
> documents referencing Coldwell Banker, and to
> take affirmative measures to stop any third
> party from holding you out as a Coldwell
> Banker franchise, among other actions.

Id.; see also Pl.'s Mem., Bertet Aff., Ex. G, ¶ 14.3(e)
(providing for franchisee's immediate discontinuation of usage of
CB's marks).

Over a three-day period in January 2007, in conjunction with CB's termination of the Second Franchise Agreement, CB conducted an audit of the books of the Nashua and Salem franchises.  See Pl.'s Mem., Bertet Aff., ¶¶ 3-5, Ex. C; see also Def.'s Obj., Ex. C, Pl.'s Answ. to Defs.' First Set of Interrs., Nos. 6 & 7.  The audit concluded that BM Realty underreported commissions received at both offices and, as a result, owed CB $11,655.59 for the Nashua franchise and $699.82 for the Salem franchise in royalty fees, plus interest, late fees, and audit costs.  See Pl.'s Mem., Bertet Aff., Ex. C.  Because of the history of accounting discrepancies and confusion throughout his business relationship with CB, Moses did not accept the amounts CB determined was owed. See Moses Dep. at 169:18-170:22.

The termination audit included a physical inspection of the franchise offices by a CB auditor, Steve Palladino, to determine whether BM Realty continued to associate itself with CB.  See Def.'s Mem., Ex. 3 (email correspondence and audit report from Palladino, Manager of Franchise Audit Services).  The Nashua franchise still contained some office equipment, CB plaques and trophies, and was functioning as an office for BM Realty's former manager.  Palladino observed the phone there was answered "Brian Moses Realty and Associates"; however, he concluded that "for the most part de-identification has taken place."  Id.  The Salem

13

franchise was empty, but a CB sign still hung outside.  Palladino
was concerned that the public might think CB was still affiliated
with the empty, Salem office space because of the exterior sign.
Id. at CB-0747 & CB-0122.  On March 29, 2007, CB inspected the
Salem office again and found the sign still hanging there.  See
id. at CB-0129.  It was finally removed more than a year later,
on April 16, 2008.  See Pl.'s Mem., Ex. 4 at 8.  As part of his
audit, Palladino also checked Moses's website in January 2007 and
again in March 2007, and found that the CB marks thereon had been
replaced with Re/Max marks.  See Def.'s Mem., Ex. 3 at CB-0745-
46, CB-0129.

     After ending his affiliation with CB, Moses continued to
identify his success with CB on both his resume and website.  He
advertises himself as having "[b]een ranked in the Top 10
Worldwide for Sales within Coldwell Banker Real Estate
Corporation."  See Def.'s Mem., Ex. 1, Brian Moses's November 12,
2009, Affidavit ("Moses's Aff."), ¶ 10.[9]  Since September 1,
2006, when he stopped working with CB, Moses has not used any of

---

[9]CB argues Moses's promotion of himself as in the "Top Ten
Worldwide for Sales" within CB misleads the public into thinking
he continues to work as a CB salesman.  In response, Moses
represented to the court that he has changed his website and his
resume to add the modifier "formerly" to his "Top 10 Worldwide"
ranking.  See Def.'s Mem., Moses's Aff. ¶ 10.  As recently as
December 8, 2009, however, Moses's website did not reflect that
clarification.  See Pl.'s Obj to Defs.' Mot. for Summ. J.
(document no. 59) ("Pl.'s Obj."), Rachel L. Celano's December 10,
2009, Aff. ("Celano Aff."), ¶ 3.

the CB advertising materials he generated and disseminated over his ten-year relationship with CB.  See id. ¶¶ 8-9.  There remain a number of real estate listings in both the yellow pages and on the internet, however, that still have BM Realty described as a "CB affiliate."  See id. ¶ 12.  Moses retains his real estate brokerage license but has not worked as an agent since leaving CB in 2006.  See id. ¶¶ 2-5.  Moses has continued his work as a real estate sales trainer and coach for real estate agents, and maintains a website that provides information about the selling process to buyers and sellers.  See id. ¶¶ 2 & 5.

## 2.  Standard of Review

Summary judgment provides the means to "pierce the boilerplate of the pleadings" and dispose of those cases or claims where "no trialworthy issue exists."  Quinn v. City of Boston, 325 F.3d 18, 28 (1st Cir. 2003).  It is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue is one "that properly can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party."  Anderson v. Liberty

15

Lobby, Inc., 477 U.S. 242, 250 (1986).  A material fact is one
"that might affect the outcome of the suit."  Id. at 248.  In
ruling on a motion for summary judgment, the court construes the
evidence in the light most favorable to the nonmovant.  See
Navarro v. Pfizer Corp., 261 F.3d 90, 94 (1st Cir. 2001).

The party moving for summary judgment bears the initial
responsibility of demonstrating the absence of a genuine issue of
material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323
(1986).  Once the moving party has met its burden, the burden
shifts to the nonmovant to "produce evidence on which a
reasonable finder of fact, under the appropriate proof burden,
could base a verdict for it; if that party cannot produce such
evidence, the motion must be granted."  Ayala-Gerena v. Bristol
Myers-Squibb Co., 95 F.3d 86, 94 (1st Cir. 1996) (citing Celotex,
477 U.S. at 323 and Anderson, 477 U.S. at 249).  Neither
conclusory allegations, improbable inferences, nor unsupported
speculation are sufficient to defeat summary judgment.  See
Carroll v. Xerox Corp., 294 F.3d 231, 236-37 (1st Cir. 2002); see
also Price v. Canadian Airlines, 429 F. Supp. 2d 459, 461 (D.N.H.
2006).  On cross motions for summary judgment, the standard of
review is applied to each motion separately.  See Am. Home Assur.
Co. v. AGM Marine Contrs., Inc., 467 F.3d 810, 812 (1st Cir.
2006); see also Mandel v. Boston Phoenix, Inc., 456 F.3d 198, 205

(1st Cir. 2006) ("The presence of cross-motions for summary judgment neither dilutes nor distorts this standard of review.").

CB has moved for summary judgment on its breach of contract claims, which are counts 1, 2, 3, 4 and 6,[10] and on all four of BM Realty's counterclaims for (1) fraud in the inducement of the Second Franchise Agreement, (2) negligent misrepresentation related to the Second Franchise Agreement, (3) breach of contract or unjust enrichment with respect to both franchise agreements, and (4) unfair trade practices in violation of New Hampshire's Consumer Protection Act ("CPA"), N.H. Rev. Stat. Ann. ("RSA") 358-A.  BM Realty has cross moved for summary judgment on count 2, which  alleges breach of contract related to a promissory note, and also has moved for summary judgment on counts 8 - 11 related to CB's trademark infringement claims.  Each claim is addressed below.

---

[10]Counts 5 and 7 are the only counts not included in the pending motions.  Count 5 is another breach of contract claim based on BM Realty's alleged violation of the First and Second Franchise Agreements' post-termination provisions governing the use of CB's marks.  Since CB has not moved for summary judgment on its trademark infringement claims, it similarly has not sought summary judgment on the related breach of contract claim.  Count 7 seeks relief under the Guaranty executed by Moses; however, since all claims against Moses personally were resolved, see supra n. 1, the Guaranty-related claims asserted in count 7 are moot.

### 3.  Analysis

#### A.  Breach of Contract Claims

As an initial matter, both CB and BM Realty move for summary judgment on count 2, by which CB seeks to recover money owed pursuant to the Development Advance Promissory Note that came due on December 31, 2001.  <u>See</u> Pl.'s Mem., Ex. D (executed promissory note).  BM Realty argues that CB's claim is barred by the statute of limitations.  Without conceding that its claim based on the promissory note is time-barred, CB has elected not to contest BM Realty's argument.  <u>See</u> Pl.'s Reply (document no. 63) at 1, n. 1; <u>see also</u> Pl.'s Obj. at 1.  Finding no reason to discredit BM Realty's assertion that the claim in question is time-bared, summary judgment is granted in favor of BM Realty on count 2.

The remaining breach of contract claims are based on the two franchise agreements.  In counts 1 and 4, CB alleges BM Realty breached the First and Second Franchise Agreements, respectively, by not fully paying amounts due for royalties, advertising fees and associated costs.  In counts 3 and 6, CB claims BM Realty breached the Second Franchise Agreement by abandoning the Salem franchise and by violating the contract's non-compete clause.  BM Realty counters that summary judgment is not appropriate on any of these contract claims.  It disputes the amounts allegedly owed

18

for royalties and advertising fees asserted in counts 1 and 4, and argues that CB failed to timely disclose the requisite expert witness to prove those damages.  With respect to counts 3 and 6, BM Realty again contends CB's late disclosure of an expert witness prevents it from proving damages.  BM Realty also denies that its other work violated the non-compete provisions of the Second Franchise Agreement, which BM Realty argues were not enforceable beyond the term of the contract and were an unreasonable restraint of trade.

### (1) Counts 1 & 4:  Failure to Pay

Moses, on behalf of BM Realty, admitted that BM Realty owed CB money for royalties and advertising fees at the end of both the First and the Second Franchise Agreements.  See Moses's Dep. at 78:8-79:19, 130:22-131:15, 164:15-165:10 & 170:3-22.  This evidence clearly establishes that there is no genuine dispute about the material fact that BM Realty failed to pay certain amounts due CB, in breach of both franchise agreements, see Pl.'s Mem., Exs. A & G, ¶ 7.2 (royalty fees) & ¶ 8.2 (advertising fees).  Accordingly, with respect to BM Realty's liability on counts 1 and 4, summary judgment is warranted.  Genuine questions of material fact remain, however, regarding the amount of CB's damages.

BM Realty argues CB's damages evidence should not be considered because CB failed to timely disclose the witness on whom its damages analysis relies, to identify her as an expert witness, and to explain the methodology she used to calculate the damages.  BM Realty correctly asserts that if a party fails to timely disclose a witness, that party may be precluded from using that witness to supply evidence in support of a summary judgment motion or at trial.  See Fed. R. Civ. P. 37(c)(1).  BM Realty also correctly argues "[t]here is no fixed or general rule that [r]equires expert testimony.  However, the rule does dictate that where the [t]opic requires special experience, only the testimony of a person of that special experience will be received." Randolph v. Collectramatic, Inc., 590 F.2d 844, 848 (10th Cir. 1979) (citing II Wigmore on Evidence (3rd ed.), §§ 555 & 556; VII Wigmore § 2090).  After considering the facts and arguments of both parties, I find that CB's witness on damages was properly disclosed.

Parties are required to disclose identifying information of people "likely to have discoverable information – along with the subjects of that information – that the disclosing party may use to support its claims . . .." Fed. R. Civ. P. 26(a)(1)(A).  CB proposes to use Jacqueline Bertet, Senior Director, Real Estate Financial Services for CB, as its witness on damages.  The

undisputed record shows that CB timely disclosed Bertet's predecessor, Beth Klepar, who left CB in July 2008 and whose position was then filled by Bertet.  <u>See</u> Pl.'s Reply, Ex. B (Jacqueline Bertet's 12/28/09 Affidavit ("Bertet 2nd Aff.")), ¶¶ 3-5.  While CB did not supplement its disclosure with Bertet's name, as required by Rule 26(e)(1)(A), that error is harmless because the change in name of the individual holding the position of "Senior Director, Real Estate Financial Services for Coldwell Banker Real Estate LLC" does not materially alter the initial disclosure of this potential witness.  BM Realty was on notice that CB intended to rely on its Senior Director of Real Estate Financial Services as a witness, and BM Realty has not shown any harm from the name change.

BM Realty next contends that CB should be barred from relying on Bertet because she was not disclosed as an expert witness.  Expert witness testimony is only necessary when "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.  Proof of damages may require, but does not necessarily require, an expert witness. <u>See</u> <u>e.g.</u> <u>Bowling v. Hasbro, Inc.</u>, 582 F. Supp. 2d 192, 203 (D.R.I. 2008) (allowing patentee to testify in support of his royalty damages without expert testimony), <u>aff'd</u>, 2009 U.S. App.

LEXIS 20408 (Fed. Cir. Sept. 15, 2009).  The franchise agreements here explicitly provided the manner in which the royalty and advertising fees were to be calculated in the ordinary course of the ongoing business operations of both franchises.  <u>See</u> <u>id.</u> at 202-03 (citing cases).  The business records involved here, <u>see</u> Bertet Aff., Exs. B & J, are not the type of scientific or technical evidence that would require expert witness testimony to explain their meaning to the trier of fact.  <u>See</u> Fed. R. Evid. 702 (providing when expert testimony is needed).  As a result, an expert witness is not necessary to introduce this evidence, and CB's failure to disclose Bertet as an expert witness does not warrant the Rule 37(c)(1) sanction BM Realty seeks.

CB has properly relied on Bertet to introduce its damages evidence.  As CB's Senior Director of Real Estate Financial Services, whose professional responsibilities include supervising the maintenance of these business records, <u>see</u> Pl.'s Mem., Bertet Aff. ¶¶ 13 & 21, Bertet is qualified to authenticate the documents.  <u>See</u> Fed. R. Civ. P. 803(6) (defining business records and requiring a qualified witness to explain how the records are kept in the ordinary course); <u>see also</u> <u>Wallace Motor Sales, Inc. v. Am. Motor Sales Corp.</u>, 780 F.2d 1049, 1060 (1st Cir. 1985) ("The determination of whether a foundation has been properly laid for application of Federal Rules of Evidence 803(6) and

whether the circumstances indicate lack of trustworthiness is within the discretion of the district court."); <u>Downeast Ventures, Ltd. v. Wash. County</u>, 450 F. Supp. 2d 106, 109-110 (D. Me. 2006) (explaining that lay witnesses whose job experience gives them specialized knowledge can testify about the value or projected profits of a business).  Because of the personal knowledge that she has acquired from her experience working for CB, Bertet's testimony on damages is admissible under Rule 701. <u>See</u> <u>Wallace Motor Sales, Inc.</u>, 780 F.2d at 1061 (defining qualified witness as "one who can explain and be cross-examined concerning the manner in which the records are made and kept"); <u>see</u> <u>also</u> <u>Downeast Ventures, Ltd.</u>, 450 F. Supp. 2d at 110 (explaining Rule 701 allows testimony from witnesses whose particularized knowledge and expertise comes from their business experience).

Since Bertet did not need to be disclosed as an expert, BM Realty's argument that CB is barred from using her testimony because it failed to disclose her by the deadline for expert disclosure is unavailing.  The fact that Bertet rather than Klepar, as CB's Senior Director of Real Estate Financial Services, signed the affidavit authenticating the evidence in support of CB's summary judgment motion is not the type of late surprise or sudden ambush that could reasonably be understood as

23

prejudicing BM Realty.  Cf. Lohnes v. Level 3 Commc'ns, Inc., 272
F.3d 49, 60 (1st Cir. 2001) (precluding expert witness disclosed
three months after discovery closed).  Both the witness testimony
and the business records are admissible.

        While CB may rely on Bertet to demonstrate the damages
caused by BM Realty's failure to pay, there remain genuine issues
of material fact about how CB and Bertet calculated the amount of
damages.  See Pl.'s Mem., Bertet Aff. ¶¶ 3-5, 8-10, 13, 14, 20 &
21.  In particular, there is nothing in the record that explains
how CB calculated the figures listed in the January 26, 2007,
audit letter to Moses.  See id., Ex. J.  The audit report from
Steve Palladino provides no illumination or clarification.  See
Def.'s Mem. Ex. 3 at CB-0746 ("the following fees are outstanding
for this company which, at this time, does not include any audit
assessments.. . .  I won't have a clear view of the audit
assessment until Tuesday but it would not surprise me to see this
audit top $8,000 including additional interest and NAF fees.").
Nor is it clear how CB generated the November 6, 2007, "Custom
Account Status Reports" for the Nashua and Salem franchises.  See
id., Exs. B & J.  Nothing in the current record substantiates
Bertet's representation that BM Realty owes $6,876.00 in
advertising fees under the First Franchise Agreement and
$1,517.00 in advertising fees under the Second Franchise
Agreement.  See id. ¶¶ 4 & 9.  It is also unclear what CB meant

in the audit letter by the reference to the "untimely ad fee due." See id., Ex. C.  These questions may well be resolved by examination of Bertet at trial, but they preclude the award of summary judgment on the issue of damages with respect to the failure to pay breach of contract claims asserted in counts 1 and 4.

(2) Count 3:  Abandonment

CB next moves for summary judgment on count 3, in which it alleges BM Realty breached the Second Franchise Agreement by abandoning the Salem franchise on September 1, 2006, when the agreement was not set to expire until January 18, 2011.  The Second Franchise Agreement explicitly provided that CB could immediately terminate the contract upon written notice to BM Realty if BM Realty "abandon[ed] the Franchised Business by failing to operate the Office for 7 consecutive days."  See Pl.'s Mem., Bertet Aff., Ex. G, ¶ 13.2(g).  The record is replete with undisputed evidence that Moses and BM Realty ceased operating the Salem franchise on September 1, 2006, when they knew the Second Franchise Agreement was not set to expire until January 18, 2011, in clear violation of § 13.2(g).[11]  CB's motion for summary

---

[11]Though BM Realty argues it initially believed that the Salem franchise was coterminous with the Nashua franchise, Moses knew at least by September 2005 it was not.  See Def.'s Mem., Ex. D at CB-0731 (9/19/05 email exchange between Moses and CB).

judgment as to BM Realty's liability on the abandonment breach of contract claim asserted in count 3 is granted.

BM Realty contends it is entitled to summary judgment because, as a matter of law, CB's failure to timely disclose an expert witness prevents it from proving damages on count 3. Regardless of whether or not CB can prove damages on count 3, it only moved for summary judgment on the question of liability, which may be resolved on summary judgment independent of the issue of damages.  See Fed. R. Civ. P. 56(d)(2).  BM Realty's argument that summary judgment must be denied because damages have not been, and cannot be, proven is meritless.  The fact that CB has not disclosed a damages expert does not preclude the determination of liability.

CB's failure to disclose of a damages expert also does not necessarily preclude the determination of damages.  While lost profits may be established with the aid of an expert witness, see, e.g., Seahorse Marine Supplies, Inc. v. P.R. Sun Oil Co., 295 F.3d 68, 80-81 (1st Cir. 2002), an expert witness is not always required.  As discussed above, see supra, § 3.A(1):

> Most courts have permitted the owner or
> officer of a business to testify to the value
> or projected profits of the business, without
> the necessity of qualifying the witness as an
> accountant, appraiser, or similar expert. . . .
> Such opinion testimony is admitted not
> because of experience, training or

26

> specialized knowledge within the realm of an
> expert, but because of the **particularized
> knowledge that the witness has by virtue of
> his or her position in the business.**  The
> amendment [to Rule 701] does not purport to
> change this analysis.

Downeast Ventures Ltd., 450 F. Supp. 2d at 110 (quoting the
advisory committee notes that clarify the 2000 amendment to Rule
701 about when an expert witness, rather than a lay witness, is
needed) (emphasis in original)).

To establish lost profits due to BM Realty's abandonment, CB
may call an employee whose work makes him or her familiar with
the Salem franchise's past profit margins and knowledgeable of
other comparable CB franchises' profitability.  See Von Der Ruhr
v. Immech Int'l, Inc., 570 F.3d 858, 862-63 (7th Cir. 2009)
(describing circumstances when lay witnesses can testify about
lost profits); see also Wallace Motor Sales, Inc., 780 F.2d at
1062 (allowing lost profit damages to be based on an internal
financial statement without any expert testimony); Jay Edwards,
Inc. v. New England Toyota Distrib., 708 F.2d 814, 820 & n.4 (1st
Cir. 1983) (permitting corporate officer to testify as to lost
profits).  The jury can then weigh that evidence against all the
other evidence to determine whether to award damages and, if so,
how much to award.  See Seahorse Marine Supplies, Inc., 295 F.2d
at 81 (explaining credibility and weight of evidence are within

27

the jury's province).  The fact that damages are not now determinable is irrelevant to the grant of summary judgment on BM Realty's liability for abandoning the Salem franchise in breach of the Second Franchise Agreement.

### (3) Count 6:  Non-compete Clause

In count 6, CB alleges BM Realty violated the Second Franchise Agreement by rendering services to Re/Max Realty during the term of the contract, in violation of the agreement's provision not to engage in any competitive business.  <u>See</u> Pl.'s Mem., Bertet Aff., Ex. G, ¶ 15.2.  Like its abandonment claim, CB has moved for summary judgment only on the question of liability. <u>See</u> Fed. R. Civ. P. 56(d)(2).

BM Realty counters that Moses's business as a speaker, trainer and coach does not violate the non-compete clause, that CB has failed to show damages, that the non-compete clause must be voided as overly broad, and finally that the clause was unenforceable once the contract was terminated.  All four of these arguments are unpersuasive and readily dismissed.  First, CB challenges BM Realty's work with Re/Max, not Moses's work as a trainer, speaker and coach.  Second, the damages issue presents no obstacle to granting summary judgment on liability, as discussed at length above.  Third, the non-compete clause is not overly broad and, in fact, is self-limiting in terms of both time

and scope.  See Pl.'s Mem., Bertet Aff., Ex. G, ¶ 15.2 (defining

"competitive business").[12]  Finally, it is undisputed that the

clause was enforceable only during the term of the Second

Franchise Agreement.  See id.

> The non-compete clause provided, in relevant part:

> > During the Term, neither the Franchisee nor
> > any of the Franchisee's owners . . . shall
> > without Franchisor's prior review and written
> > consent:

> > a.    Divert or attempt to divert any business
> >       or customer of the Franchised Business
> >       to any Competitive Business by inducement
> >       or otherwise, diminish the Gross Revenues
> >       of the Franchised Business, or do anything
> >       injurious to the goodwill associated with
> >       the Coldwell Banker Marks or the integrity
> >       of the Coldwell Banker System; or

> > b.    Directly or indirectly own any legal or
> >       beneficial interest in, or render services
> >       for or give advice to, any Competitive
> >       Business located anywhere.

Id.  BM Realty proffers that this clause is unduly broad because

it would prevent, for example, Moses's son from "rendering the

service" of roofing a Re/Max office building.  That argument

---

[12]The only law BM Realty cites in support of its "unduly
broad" argument is inapposite.  It is a New Hampshire case about
post-employment restrictive covenants.  The Second Franchise
Agreement is governed by New Jersey law, see id., Ex. G, ¶ 16.4,
and its non-compete clause restricts BM Realty only during the
term of the agreement.  New Jersey law expressly recognizes the
validity of such contracts that protect legitimate business
interests.  See e.g. Acme Plastics v. Int'l Fixtures, Ltd., No.
02-5906, 2007 WL 1321197, *5-6 (D.N.J. May 4, 2007) (citing
Solari Indus. v. Malady, 55 N.J. 571, 576 (1970)).

stems from a fractured reading of subparagraph b which, when read in context, clearly intends to prevent franchisees from competing with CB by engaging in similar real estate sales work and the ancillary services that CB provides.

A review of the record reveals that BM Realty violated this non-compete provision.  In July 2006, Moses negotiated the Merger Agreement with Re/Max, a competing residential real estate agency in the Salem market, to combine BM Realty's agents and business with Re/Max.  The agreement was explicitly designed to enable Re/Max to grow its market share by using customer information from the Salem franchise.  See Pl.'s Mem., Ex. 2.  The agreement provided that Moses, the sole owner of BM Realty, would:

> receive the same percentage of company dollar he currently does **on any business brought with him or his agents that closes at Re/Max**, except that Re/Max will retain 5% of the gross. . . . **[Moses] will provide a list to Re/Max prior to the finalization of the merger of all listings, buyer contracts, and pending sales.**

Id. at Re/Max 0035 (emphasis added).  The Merger Agreement also expressly provided for Re/Max to receive commissions, marketing fees and other service costs based on "the sales of any listings brought to RE/MAX from CB Brian Moses, and the sales to any existing buyers brought to RE/MAX from CB Brian Moses . . .."  Pl.'s Mem., Bertet Aff., Ex. 2 at Re/Max 0037.

The Merger Agreement became effective either on August 8 or September 5, 2006.  <u>See</u> <u>id.</u> at Re/Max 0037-8 (providing an effective date of September 5 and a start date of August 8, 2006).  At the time of the Merger Agreement, BM Realty knew the Second Franchise Agreement was still in effect.  <u>See</u> Pl.'s Mem., Ex. 6 (article announcing the merger of BM Realty and Re/Max which brought 11 BM Realty agents to Re/Max) & Ex. 7 (article in which Moses admitted he still had five years left on the Salem franchise); <u>see</u> <u>also</u> Def.'s Mem., Ex. D at CB-0731-32 & CB-0854 (email correspondence where Moses expresses his desire to get out of the Salem franchise); Moses Dep. at 199:9-200:21 (same).  This uncontroverted evidence demonstrates that BM Realty's agents went to Re/Max and brought their business with them.  <u>See</u>, <u>e.g.</u>, Moses Dep. at 201:14-23, 204:17-205:7, 206:3-14 & 211:15-213:23; <u>see</u> <u>also</u> Pl.'s Mem., Ex. 4 at 6 (Def.'s Answers to Pl.'s First Set of Interrogs.).

The record amply demonstrates that BM Realty diverted or attempted to divert business or customers of CB to a competitive business and to diminish the gross revenues of BM Realty's CB Salem franchise, in violation of the Second Franchise Agreement's non-compete provisions.  BM Realty breached that clause at least as early as July 28, 2006, when it executed the Merger Agreement, <u>see</u> Pl.'s Mem. Ex. 2, and continued to breach it during the five

31

to six month period before CB terminated the Second Franchise
Agreement on January 9, 2007.[13]  See id., Bertet Aff., Ex. I.
Summary judgment in plaintiff's favor is appropriate on the issue
of BM Realty's liability for breach of the Second Franchise
Agreement's non-compete clause asserted in count 6.

### B.  BM Realty's Counterclaims

CB next moves for summary judgment on BM Realty's
counterclaims, which are:  (1) fraud in the inducement of
contract, related to the Second Franchise Agreement; (2)
negligent misrepresentation related to the Salem franchise and
the Second Franchise Agreement; (3) breach of contract or,
alternatively, unjust enrichment related to both franchise
agreements; and (4) violations of the CPA, RSA 358-A, based on
the unfair trade practices alleged in the first three
counterclaims.  CB first argues both the fraud in the inducement
claim and the negligent misrepresentation claim are barred by the
statute of limitations.  CB also asserts that BM Realty has not
demonstrated that facts, rather than opinions, were fraudulently

---

[13]CB has failed to demonstrate how BM Realty can be held
liable through the original termination date of January 18, 2011,
see Pl.'s Mem. at 13, when CB terminated the Second Franchise
Agreement effective January 9, 2007.  The non-compete clause
clearly provided that its restrictions were only for the term of
the contract.  A fair reading of the contract establishes that
the clause was not enforceable after January 9, 2007.

or negligently misrepresented.  CB next contends that BM Realty's third counterclaim for breach of contract or unjust enrichment should be summarily denied because the franchise agreements were fully integrated contracts with no provision for the referral business BM Realty claims CB erroneously withheld.  Finally, CB avers that since none of the first three counterclaims can prevail, the CPA claim based on those same acts necessarily fails.  The arguments are disposed of as set forth below.

<u>(1) Choice of Law</u>

Before analyzing BM Realty's counterclaims, including those sounding in tort, the court must determine which law applies. Despite the franchise agreements' choice-of-law provisions, it is not entirely clear what law applies when the dispute sounds in tort rather than contract.  <u>See</u> <u>Stonyfield Farm, Inc. v. Agro-Farma, Inc.</u>, No. 08-cv-488-JL, 2009 WL 3255218, at *4-6 (D.N.H. Oct. 7, 2009) (canvassing law about when contract choice-of-law clauses govern tort claims).

In a diversity action such as this, the forum state's substantive law governs, including its choice-of-law rules.  <u>See</u> <u>New England Surfaces v. E.I. du Pont de Nemours & Co.</u>, 546 F.3d 1, 9 (1st Cir. 2008) (looking to the forum's law to determine whether the contractual choice of law provision would be upheld); <u>see</u> <u>also</u> <u>Allstate Ins. Co. v. Occidental Int'l</u>, 140 F.3d 1, 3

(1st Cir. 1998) (following rule that a federal court sitting in diversity must apply the choice of law rules of the forum state). New Hampshire law usually will uphold a contract's selection of a forum's law as long as "the contract bears any significant relationship to that jurisdiction." Hobin v. Coldwell Banker Residential Affiliates., Inc., 144 N.H. 626, 628, 744 A.2d 1134, 1137 (2000); cf. Glowski v. Allstate Ins. Co., 134 N.H. 196, 197-98, 589 A.2d 593, 595 (1991). However, the choice will not necessarily be extended to tort claims arising out of the contract. See Stonyfield Farms, Inc., 2009 WL 3255218 at *4.

A contract's choice-of-law clause will be construed to apply to tort claims if the provision expressly governs both the agreement and the "legal relationships" between the parties. See Hobin, 144 N.H. at 628-29, 744 A.2d at 1137 (applying chosen law to tort claims); see also Stonyfield Farm, Inc., 2009 WL 3255218 at *4-5 (relying on the contract's language to determine the scope of the choice-of-law clause); Lambert v. Kysar, 983 F.2d 1110, 1121-22 (1st Cir. 1993) (enforcing forum selection clauses in contract-related tort actions involving the same operative facts as a parallel claim for breach of contract). Like the contract at issue in Hobin, the franchise agreements here clearly provide that the law chosen will govern the parties' agreements and their relationships. See Pl.'s Mem., Bertet Aff., Ex. A, ¶

16.8 (First Franchise Agreement) & Ex. G, ¶ 16.4 (Second

Franchise Agreement).   Under these circumstances, New Hampshire's

choice-of-law rules require BM Realty's counterclaims to be

governed by the same law as that selected by the parties in the

two franchise agreements.   See Hobin, 144 N.H. at 628-29, 744

A.2d at 1137; see also Ferren v. Gen. Motors Corp., 137 N.H. 423,

425, 628 A.2d 265, 267-68 (1993) (applying the "choice-

influencing considerations" enunciated in Clark v. Clark, 107

N.H. 351, 222 A.2d 205 (1966) to explain the "predictability of

results" factor weighs heavily in honoring the choice of law

selected); cf. Stonyfield Farms, Inc., 2009 WL 3255218 at *6 and

n.8 (reviewing New Hampshire law which suggests a contractual

choice might still need to pass the Clark test to be

enforceable); see generally Restatement (Second) Conflict of

Laws, § 187 (1971).

Accordingly, the first and second counterclaims, which

relate to the formation of the Second Franchise Agreement and

challenge the information on which Moses allegedly relied when he

contracted with CB, are governed by New Jersey law.   The third

counterclaim directly challenges the performance of both

franchise agreements and, therefore, invokes both California and

New Jersey law.   CB's statute of limitations defense is governed,

however, by New Hampshire law.   See Lago & Sons Dairy, Inc. v.

35

<u>H.P. Hood, Inc.</u>, No. Civ. 92-200-SD, 1994 WL 484306, *10 (D.N.H.
Sept. 6, 1994) (citing <u>Keeton v. Hustler Magazine</u>, 131 N.H. 6,
13-14, 549 A.2d 1187, 1191 (1988) for the proposition that
statutes of limitations are usually a matter of procedure and so
follow the forum's rule); <u>McLaughlin v. UNUM Life Ins. Co.</u>, 224
F. Supp. 2d 283, 290 (D. Me. 2002) (citing authority for the rule
that choice of law provisions do not apply to statutes of
limitations unless they are expressly referenced).

### (2) Counterclaim 1:  Fraud in the Inducement

BM Realty asserts that CB fraudulently induced it to enter
the Second Franchise Agreement by telling Moses the agreement was
coterminous with the First Franchise Agreement.  To show fraud in
the inducement of a contract under New Jersey law, BM Realty
"must demonstrate: 1) a material misrepresentation of a presently
existing or past fact, 2) reasonable reliance on the
misrepresentation by the plaintiff, and 3) resulting damages to
the plaintiff." <u>Mortellite v. Novartis Crop Prot., Inc.</u>, 460
F.3d 483, 493 (3d Cir. 2006) (citing New Jersey authority).  The
misrepresentation can come directly from a party to the contract
or indirectly through a party's agent, who makes the false
statement "'with the intention that the victim hear it, rely on
it, and act to his or her detriment.'" <u>Id.</u> (quoting <u>Kaufman v.
I-Stat Corp.</u>, 165 N.J. 94, 109, 754 A.2d 1188, 1195 (2000)).  The

36

"key factor" in a fraud in the inducement claim is "the alleged
misstatement must be a misrepresentation of a fact as it existed
at the time of the misrepresentation or at some time prior to the
misrepresentation." Luscko v. S. Container Corp., No. 06-3896
(WHW), 2009 WL 5171868, at *4 (D.N.J. Dec. 23, 2009) (internal
quotations omitted).

BM Realty's claim fails on the second prong, reasonable
reliance.  BM Realty argues that it relied on CB's false
representations of the fact that the Second Franchise Agreement
terminated September 1, 2006.  Even if BM Realty understood that
the two agreements were coterminous, it cannot prevail because
any reliance on that mistaken belief was unreasonable in light of
the clear, unambiguous language of the contract.  See Mortellite,
460 F.3d at 493 (explaining how reliance must be justifiable);
see also Restatement (Second) of Torts, § 533 (1977).  Right up
front, the Second Franchise Agreement provides:

> **Term of Agreement**:  After this Agreement has
> been signed by the parties, it becomes
> effective on **January 18, 2001** (the "Effective
> Date").  This Agreement shall expire on the
> date 10 years from the Effective Date (the
> "Expiration Date").  The period starting on
> the Effective Date and ending on the
> Expiration Date is the "Term" of the
> Agreement.

Pl.'s Mem., Bertet Aff., Ex. G, ¶ 1.5 (emphasis in original).
Without assessing the credibility of Moses's testimony that CB

37

employees told him the two franchise agreements were, or could

be, coterminous, this explicit language states unequivocally the

termination date, thereby eviscerating BM Realty's claim that CB

misrepresented the termination date and rendering its reliance on

CB's alleged misrepresentation unreasonable.[14]  The plain meaning

of the clause is that the expiration date was January 18, 2011.

This conclusion is not altered by BM Realty's assertion that

the misrepresentations preceded the written contract.  See Atl.

Pier Assocs. v. Boardakan Rest. Partners, 647 F. Supp. 2d 474,

489 (E.D. Pa. 2009) (precluding evidence of prior fraudulent

representations where contract deals directly with the alleged

misrepresentation and is a fully integrated written agreement).

"The parol evidence rule provides that any previous oral

representations or agreements, offered to vary, modify, or

supersede the written contract, [are] inadmissible in evidence."

Genesis Bio-Pharm., Inc. v. Chiron Corp., 27 Fed. Appx. 94, 99

(3d Cir. 2002) (internal quotation omitted).  As a matter of

---

[14]Though BM Realty asserts that the clause is "vague and
misleading," in contrast to the First Franchise Agreement which
it claims is "clear and unequivocal," see Defs.' First Am.
Countercls., ¶¶ 21 & 22, in fact the First Franchise Agreement
termination provision is identical to the Second Franchise
Agreement termination provision, except that the First Franchise
Agreement substitutes the actual date for the words "the date 10
years from the effective date."  See Pl.'s Mem., Bertet Aff., Ex.
A, ¶ 1.5.

substantive contract law, the parol evidence rule prevents a party to a contract from offering extrinsic evidence to vary the terms of a fully integrated written contract.  <u>See</u> <u>id.</u> (citing <u>Compton Press, Inc. Employees' Profit Sharing Ret. Plan v. Granada Invs., Inc.</u>, No. civ. A. 91-1256, 1992 WL 566329, at *4 (D.N.J. Nov. 23, 1992); <u>cf.</u> <u>Conway v. 287 Corp. Ctr. Assocs.</u>, 187 N.J. 259, 268-69, 901 A.2d 341, 346-47 (2006) (explaining even under New Jersey's expansive parol evidence rule, extrinsic evidence is not admissible "for the purpose of changing the writing . . . such evidence is admissible only for the purpose of interpreting the writing -- not for the purpose of modifying or enlarging or curtailing its terms") (internal quotation omitted). Because the Second Franchise Agreement contains a termination provision and an integration clause, parol evidence is inadmissible to show what Moses might have understood prior to executing the contract.

Though that ends the analysis, it bears noting that in September 2005 Moses admitted, "For whatever reason, the documentation shows that [the coterminous date] did not happen and I was not intelligent enough at the time to follow up on that detail."  Def.'s Obj., Ex. D at CB-0731.  The contract speaks for itself and clearly was not coterminous with the First Franchise

Agreement.  CB is entitled to summary judgment dismissing BM
Realty's fraud in the inducement counterclaim.

 (3) Counterclaim 2:  Negligent Misrepresentation

 BM Realty claims CB misrepresented that the Salem franchise
was a good investment when it knew, or should have known, of the
franchise's economic troubles, because it had "complete and
unfettered access to the Salem franchise's books and records and
financial history."  Defs.' Am. Countercls., ¶ 33.  BM Realty
alleges that CB withheld vital information about the franchise's
tenuous financial status and that Dowd, Shortsleeve and Aylward
misrepresented the franchise's value in several communications in
late 2000, which led Moses to decide to buy the Salem franchise.
Since Moses was falsely led to believe the Salem franchise would
help his business expand and become more profitable, BM Realty
now asserts CB is liable for negligent misrepresentation.

 To prove negligent misrepresentation under New Jersey law,
BM Realty must show that CB negligently provided false
information, on which BM Realty justifiably relied to its
detriment.  See Highlands Ins. Co. v. Hobbs Group, LLC, 373 F.3d
347, 351 (3d Cir. 2004) (stating elements of the tort); see also
Worbetz v. Ward N. Am., Inc., 54 Fed. Appx. 526, 532 (3d Cir.
2002) (citing H. Rosenblum, Inc. v. Adler, 93 N.J. 324, 461 A.2d
138, 142-43 (1983)).  Implicit in the concept of "justifiable
reliance" is that defendant owes a duty to plaintiff.  See

40

Highlands Ins. Co., 373 F.3d at 351 (clarifying that a duty of care is imposed on a speaker who knows his skill or competence will cause reliance by the seeker of the information).  To prevail, BM Realty must demonstrate that CB breached a duty owed to BM Realty when it provided misleading information about the vitality of the Salem franchise, which proximately caused BM Realty's damages.  See id. (explaining liability arises if defendant negligently provides false information to any reasonably foreseeable recipient who detrimentally relies on that information).  Negligent misrepresentations can be made by silence or suppression of truth as well as by affirmative incorrect statements.  See id. at 355.

BM Realty's argument fails for two reasons.  First, BM Realty has not shown that CB breached a duty owed to BM Realty. The Second Franchise Agreement explicitly required BM Realty to conduct its own due diligence prior to entering the agreement. See Pl.'s Mem., Bertet Aff., Ex. G, ¶ 4.2 (placing responsibility on purchaser to assess viability of franchise).  This contractual provision should have alerted BM Realty that it needed to determine independently, after consulting with advisors, whether to buy the Salem franchise.

Second, even if the court were to indulge BM Realty and assume CB owed it a duty, the undisputed record shows that Moses

41

knew the Salem franchise was a bad investment almost immediately after purchasing it, rendering any claim for negligent misrepresentation based on information conveyed before the January 18, 2001, purchase date barred by New Hampshire's three year statute of limitations.  See Lago, 1994 WL 484306 at *10 (procedural questions are governed by the forum's state law); see also RSA 508:4 (West 2010) (providing actions be brought within three years of the act, or discovery of the act, causing the injury).  BM Realty filed its counterclaims on March 31, 2008; therefore, the negligent misrepresentations had to have been made, or to have not been discovered, until sometime after March 31, 2005.  The undisputed record establishes that BM Realty in fact knew well before March 31, 2005, that the Salem franchise was plagued with problems.

That evidence includes, but is not limited to, Moses's testimony during his deposition -- as summarized below:

> Moses testified at his deposition that only two statements about the Salem franchise were false:  "That it was a good deal and a good opportunity."  Moses's Dep. at 95:16-96:12.
>
> Moses admitted that he first learned that these two statements were false "[s]hortly after I acquired the franchise.  I don't know how soon.  But within months, not years."  Id. at 96:13-16.
>
> Moses further explained that he learned about the Salem franchise not being a good deal

> before the middle of 2001, "because it was
> costing me money and not making me any
> money."  Id. at 97:18-22.
>
> Moses complained to CB in 2001 about his
> dissatisfaction with the Salem franchise,
> "what I had to do to fix it and how hard
> I had to work to turn it around."  Id.
> at 98:3-18.
>
> Moses described the decision to buy the Salem
> franchise as a "catastrophic mistake" that he
> realized as soon as he had to start paying
> the bills and saw the revenue stream.   Id.
> at 102:11-16.

This testimony demonstrates that Moses knew within months of

acquiring the Salem franchise that it was not the deal that he

had understood it to be.  BM Realty needed to file its claim for

negligent misrepresentation no later than the middle of 2004.

Instead, BM Realty filed it in March 2008.  It is, therefore,

barred by the statute of limitations.  See RSA 508:4.  Summary

judgment is granted in favor of CB on BM Realty's negligent

misrepresentation counterclaim.

### (4) Counterclaim 3: Breach of Contract or, alternatively, Unjust Enrichment

In its third counterclaim, BM Realty alleges that it

unfairly paid CB approximately $1,000,000 in royalty and

advertising fees in exchange for referral business it never

received.  BM Realty contends that CB's directing of referral

business to its competitors impeded BM Realty's ability to attain

performance goals and earn premiums awarded for achieving those goals.  BM Realty also complains that CB did not provide rebates and optional service programs which would have benefitted BM Realty and for which it paid with its royalty obligations under both franchise agreements.  BM Realty claims CB's failures to make the referrals and to provide the service programs unjustly enriched CB in breach of both franchise agreements.  This counterclaim contains a claim for both breach of contract and unjust enrichment based on both the First and the Second Franchise Agreements.

Although the two franchise agreements implicate different states' laws, the rules of contract construction and unjust enrichment are the same under both New Jersey law and California law, see Pl.'s Mem. at 26-29 (citing cases), eliminating the need to apply both states' law or to choose between them.  See Royal Bus. Group v. Realist, Inc., 933 F.2d 1056, 1064 (1st Cir. 1991); see also Fashion House, Inc. v. K Mart Corp., 892 F.2d 1076, 1092 (1st Cir. 1989) ("When a choice-of-law question has been reduced to the point where nothing turns on more precise refinement, that should end the matter.").  New Hampshire's rules of contract construction and unjust enrichment are consistent with both California and New Jersey law.  See, e.g., Cont'l Air Conditioning, Inc. v. Keller Constr. Co., No. B142230, 2003 WL 22120886, at *12 (Cal.App. 2 Dist., Sept. 15, 2003)(applying Cal.

44

law of unjust enrichment); <u>Van Orman v. Am. Ins. Co.</u>, 680 F.2d 301, 310-11 (3d Cir. 1982) (same under N.J. law); <u>J.G.M.C.J. Corp. v. Sears, Roebuck & Co.</u>, 391 F.3d 364, 370 (1st Cir. 2004) (same under N.H. law); <u>see also</u> <u>Behrens v. S.P. Constr. Co.</u>, 153 N.H. 498, 500-03, 904 A.2d 676, 679-81, 977 A.2d 515 (2009) (applying N.H. rules of contract construction, including parol evidence rule) <u>Banco Do Brasil, S.A. v. Latian, Inc.</u>, 234 Cal.App.3d 973, 1000-01, 285 Cal.Rptr. 870 (Cal.App.2.Dist. 1991) (same under Cal. law); <u>Filmlife, Inc. v. Mal "Z" Ena, Inc.</u>, 251 N.J. Super. 570, 575, 598 A.2d 1234, 1236 (N.J. Super. A.D. 1991) (same under N.J. law).  Under such circumstances, where the outcome is the same, the law of the forum should be applied.  <u>See A.M. Capen's Co. v. Am. Trading & Prod. Corp.</u>, 202 F.3d 469, 472 n.6 (1st Cir. 2000) (upholding forum's application of its law when same as other jurisdiction's law); <u>see also</u> <u>Barrett v. Ambient Pressure Diving, Ltd.</u>, No. 06-cv-240-SM, 2008 WL 4280360, at *1 (D.N.H. Sept. 16, 2008) (explaining no choice-of-law analysis needs to be done when there is no conflict between the laws); <u>Smith v. Morbark Indus.</u>, 733 F. Supp. 484, 487-88 (D.N.H. 1990) (choosing forum's law when the results are the same).

To the extent BM Realty attempts to assert an unjust enrichment claim, it necessarily fails because the equitable remedy of restitution for a benefit conferred is not available

when there is a valid, express contract between the parties.  See
J.G.M.C.J. Corp., 391 F.3d at 370 (citing Tentindo v. Locke Lake
Colony Ass'n, 120 N.H. 593, 419 A.2d 1097, 1100 (1980) for the
rule that the law will not imply a quasi-contract); see also E.
Elec. Corp. v. FERD Const., Inc., No. 05-cv-303-JD, 2005 WL
3447957, at *2 (D.N.H. Dec. 15, 2005) (precluding equitable
remedies when plaintiff has an adequate legal remedy); Presby v.
Bethlehem Vill. Dist., 120 N.H. 493, 495, 416 A.2d 1382, 1383
(1980) (describing when an implied contract arises).  The First
and Second Franchise Agreements are valid and enforceable;
accordingly, this counterclaim can only be for breach of
contract.

     BM Realty has failed to point to any provision in either
franchise agreement to support its claim that it was entitled to
referral business and, after carefully reviewing both agreements,
the court has been unable to find any basis for this alleged
contractual right.  If a right to referral business exists, it
must be found in the franchise agreements themselves, because
they are fully integrated contracts as documented by their
prefatory statements and integration clauses.  See Pl.'s Mem.,
Bertet Aff., Ex. A at CB-003 & Ex. G at CB-0057 ("The parties
agree that this agreement shall govern their relationship in
connection with franchisee's operation of its independent

residential real estate business."); <u>see</u> <u>also</u> <u>id.</u> Ex. A, ¶ 16.9
& Ex. G, ¶ 16.5.[15]  Because BM Realty has not cited a referral
clause or some other provision in the contract which could be
construed as creating a right to referrals, it cannot prevail on
its claim that CB breached the contract by not giving it referral
business.  The integration provisions bar BM Realty from claiming
it was entitled to referral business, based on discussions or
understandings it might have had separate and apart from the
written documents it signed.  <u>See</u> <u>generally</u> <u>Fashion House, Inc.</u>,
892 F.2d at 1083-84 (reviewing rules of contract construction).

The evidence also shows that Moses, on behalf of BM Realty,
realized he would not get referral business from CB, either under
the franchise agreements or independently, but instead had to
contract separately with Cendant Mobility.  <u>See</u> Moses Dep. at

---

[15]Those clauses provide:

> This Agreement constitutes the entire
> agreement of the parties.  As of the
> Effective Date, this Agreement fully
> supercedes any and all prior negotiations,
> agreements or understandings, between the
> parties pertaining to the subject matter of
> this Agreement; and there are no other oral
> or written agreements, understandings,
> representations or statements between the
> parties relating to the subject matter of
> this Agreement, other than Franchisor's
> franchise offering circular, that any party
> may rely upon or that will have any force or
> effect.

190-95.  Moses first understood this need for a separate contract

with a different company in "1996 or '98 or 2000," id. at 191:1,

and recognized at that same time that he was not getting any

referral business or the derivative benefits from such business.

Id. at 190:3-192:5.  To the extent BM Realty is asserting that

the lack of referral business breached either the covenants of

good faith and fair dealing, see Pl.'s Mem., Bertet Aff., Ex. A,

¶ 16.9(b) & Ex. G, ¶ 16.5(b), or breached the performance premium

award clauses, see id. Exs. A & G, ¶ 7.3, by preventing BM Realty

from reaching its sales goals, those claims are barred by the

statute of limitations because they accrued at least seven years

or more before this counterclaim was filed.  See Saenger Org. v.

Nationwide Ins. Licensing Assoc., 119 F.3d 55, 64 (1st Cir. 1997)

(breach of contract claim accrues when the breach occurs); see

also Coyle v. Battles, 147 N.H. 98, 100-01, 782 A.2d 902, 905

(2001) (same); RSA 508:4.[16]

Finally, though BM Realty argues that its counterclaim

encompasses more than just Cendant Mobility referrals and that CB

---

[16]BM Realty proffers no factual evidence that CB violated
its contractual obligation, presumably under ¶¶ 5.5 - 5.7 of the
franchise agreements, to provide services.  The record reflects
that CB, in fact, provided some of the policies and business
consultations anticipated by the agreements and otherwise was
free to exercise its discretion in determining the conditions
under which incentive and reward programs were offered.  See id.

in fact does make referrals independent of Cendant Mobility, this argument does not overcome the plain language of the franchise agreements that imposes no obligation on CB to refer any type of real estate sales work to BM Realty.  Moreover, BM Realty has failed to proffer any evidence that demonstrates some ambiguity in the language of the agreements that might justify the consideration of parol evidence, in order to construe the meaning of a particular clause as creating an alleged right to referral business.  See, e.g., Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 179 (1st Cir. 1995) (discussing when parol evidence is appropriate); see also Conway, 187 N.J. at 269, 901 A.2d at 346 ("antecedent and surrounding factors that throw light upon . . . [the meaning of the contract] may be proved by any kind of relevant evidence"); Alling v. Universal Mfg. Corp., 5 Cal. App. 4th 1421, 1433 (Cal. App. 1st Dist. 1992) (describing California's parol evidence rule).  Under the circumstances presented here, parol evidence is inadmissible to ascertain the meaning of the franchise agreements; they are self-explanatory. Summary judgment is granted in favor of CB on BM Realty's breach of contract counterclaim.

### (5) Counterclaim 4:  CPA Violation

BM Realty's unfair business practices claim asserts the same fraud, negligent misrepresentation and breach of contract claims

49

asserted in the first three counterclaims.  BM Realty identifies

the unfair methods of competition or unfair and deceptive trade

practices as being:  (a) the false and misleading statements that

the two franchise agreements were coterminous; (b) the false and

misleading statements about the economic viability and potential

of the Salem franchise; and (c) the conflict of interest

regarding making of referrals in breach of the franchise

agreements' provisions.  <u>See</u> Def.'s First Am. Counterclaims

(document no. 32) at 10-11.  As discussed at length above, the

three counterclaims which BM Realty premises its CPA violation on

-- fraud in the inducement, negligent misrepresentation and

breach of contract -- are unavailing.  Since summary judgment has

been awarded against BM Realty dismissing all three of these

counterclaims, the predicate acts relied on for the CPA violation

cannot give rise to a claim for unfair, immoral, unethical or

oppressive conduct that is required for a CPA claim.  <u>See</u> <u>Gilroy</u>

<u>v. Ameriquest Mortgage Co.</u>, No. 07-cv-74-JD, 2009 WL 435296, at

*5 (D.N.H. Feb. 20, 2009) (granting summary judgment where no

competent evidence has been produced to support the CPA claim).

    To the extent BM Realty might want to rely on something

separate from its counterclaims, it has failed to identify any

action or conduct distinguishable from the three other

50

counterclaims.[17]  In any event, the facts underlying BM Realty's claims against CB were known, or should have been known to Moses, in 2001, shortly after he executed the Second Franchise Agreement.  Any CPA claim based thereon is barred by the three year statute of limitations governing CPA violations.  See RSA 358-A:3, IV-a (West 2009).

Accordingly, summary judgment is granted in favor of CB on BM Realty's CPA counterclaim.

### C.  The Trademark Infringement Claims

BM Realty has moved for summary judgment on CB's trademark infringement claims asserted in counts 8 - 11.  The trademark infringement claims are all based on BM Realty's alleged continued, unauthorized use of various CB marks after CB terminated the Second Franchise Agreement on January 9, 2007.  CB contends BM Realty willfully marketed and promoted its real estate services by using CB's marks in yellow page advertising, industry publications and website promotions, which confused or deceived the public about its continued affiliation with or sponsorship by CB and which diverted both customers and revenues away from CB to BM Realty.  CB also complains that BM Realty's

---

[17]The only argument BM Realty makes in support of its CPA claim is that it relies "on previous counts that will not be dismissed."  Def.'s Obj. to Pl.'s Mot. for Summ. J. Mem. in Supp. at 21.

failure to timely remove the CB sign from the abandoned Salem
franchise office building tarnished its trademark and devalued
the goodwill associated with those marks.  CB avers this
continued use infringed and diluted its trademarks, in violation
of 15 U.S.C. §§ 1114 & 1125, and common law trademark protection.

BM Realty argues it is entitled to summary judgment because
CB has failed to show that: (1) BM Realty ever used CB's marks in
connection with any commercial marketing of its services outside
of its licensed, permitted use, (2) any use by BM Realty caused
or was likely to cause confusion to potential customers, and (3)
BM Realty's alleged use diluted the marks by tarnishing them.
Despite these contentions, the undisputed evidence shows BM
Realty, in fact, did use the CB marks in various capacities after
January 9, 2007, did not remove the CB sign from the Salem
franchise office building until April 2008, and even continued to
advertise its prior affiliation with CB on its website as
recently as December 2009.  See Pl.'s Obj., Celano Aff., ¶ 3.
These uses were without any license or authorization from CB.[18]

_____

[18]Though BM Realty claims it made no commercial use of CB's
marks, common sense leads to the conclusion that Moses would not
have promoted himself as having "[b]een Ranked in the Top Ten
Worldwide for Sales within Coldwell Banker Real Estate
Corporation" but for the economic benefit he assumed that
description would yield.  Nonetheless, BM Realty's use of the CB
ranking may be protected under the nominative fair use test.  See
Playboy Enters., Inc. v. Welles, 279 F.2d 796, 801 (9th Cir.

While the evidence of BM Realty's unauthorized use of CB's marks is uncontroverted, genuine issues of material fact remain about whether that use confused or deceived the public, diluted CB's marks, or otherwise damaged CB's goodwill as is required to show trademark infringement. Specifically, genuine issues of fact still remain about the relevant public's understanding of BM Realty's affiliation with CB after BM Realty ceased operating the Salem franchise. Factual issues also remain regarding how confused the public was likely to have been by BM Realty's use of the CB name on its website and by the continued presence of the old sign left hanging on the abandoned Salem franchise building. See Ne. Lumber Mfgs. Assoc. v. N. States Pallet Co., __ F. Supp. 2d __, __, No. 09-cv-290-JM, 2010 WL 1838570, at *4 (D.N.H. 2010)

---

2002); see also New Kids on the Block v. New Am. Publ'g, Inc., 971 F.2d 302, 308 (9th Cir. 1992). The nominative fair use test addresses the likelihood of confusion caused by the alleged infringer's use of the mark and is different from the classic fair use defense recognized in trademark infringement cases. See KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc., 328 F.3d 1061, 1071-72 (9th Cir. 2003) (explaining the difference between classic and nominal fair use), vacated 543 U.S. 111 (2004), remanded to, 408 F.3d 596 (9th Cir. 2005). The First Circuit has not decided whether to accept the nominative fair use doctrine, see Universal Commc'n Sys., Inc. v. Lycos, Inc., 478 F.3d 413, 424 (1st Cir. 2007), and based on the current record, which shows genuine disputes about what was intended to be communicated and what was likely to have been understood by BM Realty's use of the CB "Top Ten" ranking, a thorough analysis of the issue is not warranted at this time.

(explaining what must be shown to prevail on a trademark
infringement claim).

"Likelihood of confusion" is the critical issue in all
trademark infringement claims and is so here.  See id.; see
also Anheuser-Busch, Inc. v. Caught-On-Bleu, Inc., 288 F. Supp.
2d 105, 113 (D.N.H. 2003) (using the same or similar marks in a
way that confuses the public about the source of a service shows
infringement), aff'd, 105 Fed. Appx. 285 (1st Cir. 2004).  This
critical issue is a question of fact almost always left for the
jury.  See Ne. Lumber Mfgs. Assoc., 2010 WL 1838570 at *5
(listing eight factors to consider when assessing confusion); see
also Beacon Mut. Ins. Co. v. OneBeacon Ins. Group, 376 F.3d 8,
16-19 (1st Cir. 2004) (reversing summary judgment where
likelihood of confusion matrix applied to evidence raises issues
for the jury to resolve); 6 J. Thomas McCarthy, McCarthy on
Trademarks & Unfair Competition, 4th ed. (West 2009) §§ 32:120-21
(discussing limited circumstances when confusion issue can be
decided as a matter of law).  In the present case, as noted, the
facts are disputed as to whether BM Realty's use of CB's marks
was likely to cause confusion to CB's detriment.  Accordingly, BM
Realty's motion for summary judgment on CB's trademark
infringement claims asserted in counts 8 - 11 is denied.

<u>Conclusion</u>

The pending cross motions for summary judgment, document nos. 55 and 56, are disposed of as follows:

**Document no. 55 - CB's Motion for Summary Judgment** is granted in part, to award summary judgment on the issue of BM Realty's liability with respect to counts 1, 3, 4 and 6; the motion is also granted with respect to all of BM Realty's counterclaims.  CB's motion is denied with respect to BM Realty's liability on count 2, and is further denied with respect to the issue of damages for all of the breach of contract claims.

**Document no. 56 - BM Realty's Motion for Summary Judgment** is granted in part, to award summary judgment in its favor on count 2, but denied with respect to CB's trademark infringement claims asserted in counts 8, 9, 10 and 11.

**SO ORDERED.**

_____
Landya B. McCafferty
United States Magistrate Judge

Date:  September 8, 2010

cc:  Peter G. Callaghan, Esq.
     Bethany L. Appleby, Esq.
     Seth L. Huttner, Esq.
     Conrad WP Cascadden, Esq.